**Dollie W. HESTER**

v.

**SOUTHERN RAILWAY COMPANY.**
**Civ. A. No. 14130.**

United States District Court,
N. D. Georgia,
Atlanta Division.

Oct. 3, 1972.
As Amended Nov. 1, 1972.

Louise T. Hornsby, Atlanta, Ga., for plaintiff.

Sutherland, Asbill & Brennan, Atlanta, Ga., Ellsworth Hall, Jr., Macon, Ga., for defendant.

## OPINION

EDENFIELD, District Judge.

Plaintiff commenced this class action under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq. (1970), which applies to defendant, alleging that she was aggrieved of certain unlawful employment practices maintained by defendant. She complained generally that defendant discriminates in its hiring processes against blacks and females. More specifically, she alleged that defendant has a policy at its Atlanta general office of granting employment for the position Data Typist/1050 Operator ["Data Typist"] to white females who have children while denying such employment to black females who have children. Plaintiff alleged that she, a black female who had a child, applied for the position of Data Typist at the Atlanta general office but was denied employment. The complaint sought injunctive and declaratory relief on behalf of the class and reinstatement, back pay, damages and attorney's fees on behalf of plaintiff. The case was tried to the court sitting without a jury.

The Data Typist position involved in this suit was created by defendant at the Atlanta general office in October 1964 and hiring for that position began in December 1964. A Data Typist mechanically operates a computer input typing machine which produces statistical data about the composition and movement of railroad cars. The work is routine and very repetitious, and defendant has experienced a relatively high turnover rate for this position.

While it is apparent that defendant employed Data Typists in Atlanta from the end of 1964 through 1967, no evidence was introduced as to their exact racial or sexual composition. The only remotely relevant evidence introduced by plaintiff concerning this period establishes that as of February 1966 defendant reported to the Equal Employment Opportunity Commission that it employed as "office and clerical" help 248 white males, 60 white females, 11 black males, and 1 black female. Although it was not shown whether Data Typists were considered "office and clerical" employees by defendant at that time, defendant reported no other non-laborer female employees at that time, black or white, and only 27 other non-laborer and

non-managerial male employees, all white. The court deduces from this evidence that as of February 1966 defendant employed quite a few white Data Typists but few, if any, black Data Typists at the Atlanta office.

During the year 1968 defendant hired 51 females as Data Typists and Data Typist Trainees in the Atlanta office. Of this number 38 were white and 13 (25%) were black. Eighteen of the whites and nine of the blacks hired had children at the time of their employment.

From January 1, 1969 through August 31, 1969, defendant hired 22 Data Typists and Data Typist Trainees in the Atlanta office, 21 of whom were females. Of the females, 17 were white and 4 (19%) were black. There was no evidence as to how many of these females had children.

During the entire year of 1969 defendant hired 42 females as Data Typists and Data Typist Trainees in the Atlanta office. Of this number 32 were white and 10 (24%) were black. Thirteen of the whites and three of the blacks hired had children at the time of their employment.

Plaintiff introduced no evidence us to the total number of people who applied for the position of Data Typist at the Atlanta office in 1968 or 1969, nor did she introduce any evidence as to the total male:female or black:white ratio of the applicants. There was some testimony, however, that in 1969 approximately 35%–40% of those who responded to defendant's advertisements for the Data Typist position were black. As of October 2, 1969, defendant employed a total of 110 Data Typists and Data Typist Trainees. Of this number, 92 were white and 18 (17%) were black. According to the 1970 Census of Population, blacks constitute over 50% of the population of Atlanta, and black females constitute over 50% of the female population of Atlanta.

During the period June 30, 1969 through July 12, 1969, the employment department of defendant's Atlanta general office placed an advertisement in the classified section of a newspaper of general circulation indicating that defendant had immediate openings for typists willing to work at night and on weekends and able to type 60 words per minute. The purpose of this advertisement was to attract applicants for the position of Data Typist at the Atlanta office. A total of 40 persons, including plaintiff, responded to the advertisement. Of the 40, 14 were white females, 19 were black females, 5 were white males, and 2 were black males.

The 40 applicants appeared at the Atlanta office and completed application forms. Among other things, the instructions on the forms asked applicants to check whether they were willing to work any day of the week, any shift, and overtime. Plaintiff left this portion of the form blank when she applied. After the forms were completed, the group was addressed by James L. Melton, a white male, defendant's only personnel officer in Atlanta at the time. Melton explained the Data Typist position to the group and pointed out that the working hours would be from 11:00 P.M. to 7:00 A.M. After that the members of the group were given a battery of four tests:

(1) Science Research Association ["SRA"] verbal test;

(2) SRA non-verbal test;

(3) J. P. Cleaver Institute's self-description test; and

(4) SRA typing test.

None of these tests has ever been professionally validated for accuracy or relevancy, although there was some testimony that defendant is now engaged in validation studies.

According to Melton, the single most important skill for the Data Typist position is good typing, and defendant required that all successful applicants be able to achieve a score of 60 corrected words per minute on the SRA typing test. Plaintiff achieved a score of 53 the first time she took the typing test, but she was permitted to take it a sec-

ond time and passed with a score of 68. It appears that plaintiff also successfully completed the three other tests.

All those who passed the four tests, including plaintiff, were interviewed by Melton, the only representative of defendant who conducted screening interviews at that time. No applicant who was rejected by Melton at that time was considered any further by defendant for employment while approximately 95% of the applicants recommended by Melton were hired. According to Melton, the purpose of the interview was to gather information about the applicant's background, family situation, access to transportation, work habits, and personality. Melton was interested in hiring uncomplicated people who would be able to adequately perform rather dull work. It does not appear from the evidence that Melton had any written or formal guidelines from defendant as to how to conduct or score the interview, and the court deduces that this stage of the hiring process was entirely subjective.

Plaintiff testified that at her interview she told Melton she was willing to work at any time, day or night, that she and her husband had their own cars, and that her husband's grandmother would care for her 22-month-old child while plaintiff worked. Melton testified that he did not recall his interview with plaintiff nor any of the conversations he had with her. However, under examination by plaintiff's counsel, Melton identified his handwritten notes on plaintiff's application and said they were comments made in an interview. The notes said:

"21 years old, married 2 years, 1 child. Home town Atlanta, also husband works at Lockheed—has been here 4 years. H.S. Education, very prim and proper air. Parents here, mother seamstress, step father works at Scripto. Types all day now but didn't seem to like it. Has never worked nights, husband works days. Might be problem with that. Like her except for no night work experience. A big IF [*sic*]. Reject for this reason."

Despite the fact that these notes would indicate that Melton rejected plaintiff solely because she had no night work experience, Melton did not so testify. The pertinent testimony is as follows:

"Q [Plaintiff's Counsel] Then you personally rejected Mrs. Hester?

A [Mr. Melton] Yes, ma'am, I did.

Q Why did you reject her?

A I am judging strictly from my application,—

Q All right.

A —and it's really hard for me to single out any one factor. There are several factors and I threw these out—

\* \* \* \* \* \*

THE COURT: What he read from the application says he's rejecting her because she's had no night work.

THE WITNESS: These comments that we write here, let me explain why we use them.

They're not intended to be a permanent record other than they're just something to jog my memory. If something had come up on this day, one or two, three months, we possibly could have, I would have remembered it, perhaps.

I don't know how long it was before this was finally jogged to my mind.

BY [PLAINTIFF'S COUNSEL]:

Q These comments were what you were thinking at the time you interviewed her, is that right?

A Yes ma'am. But not necessarily spelling out all the strengths or all of the weaknesses or all of the factors behind my decision to hire or not hire, or to recommend hire or not hire.

Q Well, judging from that, what do you think, why wasn't she hired?

A Judging from this I would say I didn't feel that her overall background and work experience and

general personality fit what I felt would be an acceptable pattern for a data typist—and I'm just guessing, but looking at her application, her work experience, though it has been in repetitive type, I have a statement here she didn't seem to like typing all day, she has never done any night work, never done anything in a production-type work environment, never worked week-ends, her husband would have worked the day shift and she would have worked nights, they're *young* people, they had been married, well, maybe they hadn't been married a great while.

There are a lot of things that I could conjectorize [*sic*] here. Her work experience seems to be a little bit more professional, a little bit more towards the secretary, the steno, a little, maybe a cut or two above in work responsibility than what the work of a data typist would be.

Now, I'm just guessing but that would be, probably be, *from looking at the application*—I have no recollection of our conversation at all.

Q And you took into consideration everything she put on the application?

A Hopefully. Yes ma'am.

Q And you also considered that she had no night work experiences?

A Apparently. I've made a note with specific reference to that. I may have asked questions about that. I don't know.

Q Then, how many persons whom you interviewed had night work experience?

A I'm not sure.

Q Do you recall that many of them had night work experience?

A No ma'am. I don't recall that specifically.

Q Sir, was the fact that Mrs. Hester didn't indicate on the application that, in these blocks, where you asked whether or not she was willing to work any day of the week, overtime or any shift, did that have anything to do with your not hiring her?

A It could have. It might not have. I don't recall."

In view of this testimony the court cannot place much reliance on Melton's handwritten notes.

About two weeks after the interview plaintiff received a letter from defendant advising her that she was not hired. Two weeks later plaintiff noticed another advertisement in the newspaper placed by defendant concerning the very same position for which she had applied. The next day she called Melton and asked about her application. According to plaintiff, Melton said, "I'm sorry, but *you don't fit into the picture.*" Plaintiff and her husband subsequently went to visit Melton at his office but he was not in and they left a message for him to call. Plaintiff testified that she heard nothing further from Melton. Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, which was unable to resolve the matter, and this suit followed.

Plaintiff failed to make an affirmative showing during trial that the requirements of Rule 23, Fed.R.Civ.P., were met, so this case is not a valid class action. Oatis v. Crown Zellerbach Corp., 398 F.2d 496 (5th Cir. 1968). Nevertheless, since plaintiff has asserted a claim of across-the-board discrimination in the hiring of Data Typists, the court will proceed to adjudicate that general claim. *See* Tolbert v. Western Electric Co., 56 F.R.D. 108 (N.D.Ga. 1972).

 It is clear from the evidence that defendant has not discriminated against black females for the Data Typist position on the basis of sex. Practically all, if not all, Data Typists hired by defendant have been females. It is also clear that defendant has not discriminated against black females who have children as against

black females without children or white females with or without children. The evidence shows that for the years 1968–1969 12 of the 23 (52%) female blacks hired as Data Typists had children while 31 of the 70 female whites hired (44%) had children. This evidence utterly refutes plaintiff's claim that defendant does not hire black females with children for the position of Data Typist.

Plaintiff has proven, however, that defendant maintained—and apparently still maintains—a hiring procedure for the Data Typist position which has never been professionally validated for accuracy or relevancy and which, in very significant respect, is entirely subjective. In Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), the Supreme Court held that under Title VII employers are forbidden from using employment tests and measuring procedures unless they are demonstrably related to job performance. The Court endorsed the guidelines issued by the Equal Employment Opportunity Commission which set out the methods by which employment tests should be professionally validated. 29 C.F.R. § 1607 (1970). The burden is on the employer to show the relevancy of employment tests it uses, Griggs v. Duke Power Co., *supra*, at 432, 91 S.Ct. 849, 28 L. Ed.2d 158, and the employer's subjective evaluations of its own employment tests are insufficient to sustain that burden. United States v. Jacksonville Terminal Co., 451 F.2d 418 (5th Cir. 1971); Hicks v. Crown Zellerbach Corp., 319 F. Supp. 314 (E.D.La.1970). Defendant has virtually admitted that the SRA and J. P. Cleaver tests it used when plaintiff applied for the Data Typist position— and which it apparently still uses today —have not been validated, either in accordance with the Equal Employment Opportunity Commission's guidelines or in accordance with any other positive empirical evidence. There is no question that these tests, particularly the SRA typing test, were and are critical in the hiring procedure for Data Typists. Accordingly, these tests may not

be used if by their operation there is discrimination.

Moreover, a critical aspect of the hiring procedure is the post-test interview which was conducted solely by Mr. Melton at the time plaintiff applied. As the court has already found, Melton's interview was a purely subjective evaluation which, insofar as rejections were concerned, was subject to no review whatsoever. Melton was given no formal guidelines, standards, or instructions by defendant, and there were no safeguards to avert discriminatory practices. The Fifth Circuit had occasion to consider a very similar procedure used in the promotion process of a large corporation and held it unlawful. Rowe v. General Motors Corp., 457 F.2d 348 (5th Cir. 1972). The Court observed:

"All we do today is recognize that promotion/transfer procedures which depend almost entirely upon the subjective evaluation and favorable recommendation of the immediate foreman are a ready mechanism for discrimination against Blacks much of which can be covertly concealed and, for that matter, not really known to management. We and others have expressed a skepticism that Black persons dependent directly on decisive recommendations from Whites can expect non-discriminatory action." At 359.

Under *Rowe* the interview procedure used by defendant for hiring Data Typists cannot stand if by its operation there was discrimination.

This leads to the final issue: the showing of discriminatory operation. To be sure, the statistical evidence adduced by plaintiff is weak and in some respects inconclusive. Nevertheless, the court found that in the early years of the Data Typist position defendant employed few, if any, blacks. As of October, 1969, around the time plaintiff applied, only 17% of the Data Typists were black. During 1968 and 1969, when it appears whites were applying in only slightly larger numbers than blacks for the Data Typist position, three times

as many whites as blacks made it through the testing and interviewing process and were hired. In view of this disparity and the holdings in *Griggs, Jacksonville Terminal,* and *Rowe,* the court concludes that the procedure used by defendant to hire Data Typists at its Atlanta office constitutes an unlawful employment practice within the meaning of Title VII. Since this practice was not accidentally maintained by defendant, it was "intentionally" maintained within the meaning of 42 U.S.C. § 2000e–5(g), Rowe v. General Motors Corp., *supra,* and the court will enjoin it.

Plaintiff has prayed for damages, back pay, reinstatement, and costs, including attorney's fees in this case. Under 42 U.S.C. § 2000e–5(g), reinstatement and back pay may not be awarded if the refusal to hire was for any reason other than unlawful discrimination. Plaintiff applied while defendant's unlawful employment practice was in effect. She passed all the objective (but unvalidated) tests, including the critical typing test. She indicated she was willing to work at any time demanded by defendant. The only hurdle she did not overcome was the interview with Melton, and Melton testified in court that despite the fact that his notes indicated he did not want to hire her because she had no night work experience he could not state specifically why he rejected her. Under all the circumstances the court concludes that defendant's refusal to hire plaintiff was the result of an unlawful employment practice, and she is entitled to appropriate relief.

### ORDER

For the foregoing reasons the court declares that defendant's use of unvalidated employment tests and a single screening interview which has no safeguards against discriminatory operation as its method of hiring Data Typists in the Atlanta general office is unlawful

and is hereby enjoined. In addition, plaintiff Dollie W. Hester shall recover from defendant the difference between her actual earnings from the time her application for employment was rejected by defendant, up to and including the time the instant complaint was filed, and her potential earnings with defendant during that period had her application been accepted, as well as her costs in this action, including reasonable attorney's fees. Finally, should plaintiff re-apply to defendant for the Data Typist position and should defendant hire her, plaintiff shall be awarded seniority from the date her original application was rejected.

It is so ordered.*

---

* Even though this case is not a valid class action the declaratory and injunctive relief granted by the court will, of course, inure to the benefit of future applicants for the Data Typist position.