**Ravindra NATH**

v.

**GENERAL ELECTRIC COMPANY, Switchgear Division.**

**Civ. A. No. 76–2921.**

United States District Court, E. D. Pennsylvania.

Sept. 15, 1977.

Alan M. Lerner, Philadelphia, Pa., for plaintiff.

Morris R. Brooke, Philadelphia, Pa., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HUYETT, District Judge.

Following a non-jury trial concluded on August 25, 1977, we make the following Findings of Fact and Conclusions of Law as required by Fed.R.Civ.P. 52(a).

### FINDINGS OF FACT

1. Plaintiff Ravindra Nath is an Asian-Indian and a citizen of India. His race or color is brown. He is a resident immigrant in the United States.

2. Defendant General Electric Company (G.E.) is a corporation and its Switchgear Equipment Business Division is located at 6901 Elmwood Avenue, Philadelphia, Pa. Defendant is engaged in business in the Eastern District of Pennsylvania, and is an employer within the meaning of § 701(b) of Title VII of the Civil Rights Act of 1964. At all relevant times it has had fifteen or more employees working for twenty or more calendar weeks, and it has been engaged in an industry affecting interstate commerce.

3. Plaintiff attended secondary school, one year of pre-college, and two years of college at St. John's College, Agra, India. In 1962 he was selected on the basis of a written competition to transfer to engineering school at the University of Roorkee, from which he graduated in 1967 with a Bachelor's Degree in Electrical Engineering

with specialization in electronics. Upon graduation he received his school's highest award for design.

4. Upon graduation from the University of Roorkee, plaintiff obtained a job in the Controls and Instrumentation Laboratory of the U.P. State Electrical Board. After three (3) months, he left this job and obtained a job with Philips, India, Ltd., a subsidiary of Philips M.V. of the Netherlands where he remained for one (1) year after which he worked for eight (8) months for Telefunken, Ltd., before moving to the United States.

5. Plaintiff came to the United States in July, 1970. After several months he obtained a job as a salesperson with George Jensen, a retail store in New York.

6. In May, 1971 plaintiff was hired by Phoenix Steel Corporation as an Electrical Maintenance Supervisor, supervising electronics technicians, electricians and helpers who were employed in the maintenance of large electrical motors. Plaintiff remained at Phoenix Steel for approximately two and one-half (2½) years. On November 11, 1973, plaintiff left his position at Phoenix Steel to take a position with defendant.

7. Plaintiff was employed by G.E. as a Design Engineer in the Product Engineering Subsection of the Engineering Section of the Power Systems Management Business Department (PSMBD), Switchgear Equipment Business Division, from November 12, 1973 to November 15, 1974.

8. On or about October 29, 1973, plaintiff was interviewed for employment by Leonard Scharf, manager of the Product Engineering Subsection of the Engineering Section of PSMBD, and Ernest Stagliano, manager of the component relay unit of the Product Engineering Subsection.

9. Plaintiff was given an offer of employment by Mr. Scharf on October 29, 1973. Plaintiff accepted the offer, and on November 12, 1973 plaintiff commenced his employment with G.E. as a Design Engineer, Level 7 in the component relay unit of the Product Engineering Subsection at an annual salary of $13,200. Design Engineer, Level 7 was an exempt, salaried position at Level 7 in G.E.'s exempt salary structure.

10. In November, 1973, PSMBD was one of the departments of the Switchgear Equipment Business Division. Both PSMBD and the Division were located at G.E.'s plant at 6901 Elmwood Avenue, Philadelphia. PSMBD designed and made electrical relays, static terminals and auxiliary devices for use in controlling the flow of electricity. PSMBD's customers were primarily electric utilities.

11. At the time plaintiff was hired, PSMBD enjoyed a substantial and increasing volume of business, and G.E. was expanding its employment of engineers and other exempt personnel.

12. By September, 1974, the business situation had changed, and the managers of G.E.'s Switchgear Equipment Business Division decided to cut back employment immediately throughout the Division, including PSMBD.

13. The first major reduction in force occurred in late September, 1974. At that time G.E. management determined that the engineering section of PSMBD should lay off two engineers.

14. There were four subsections in the engineering section of PSMBD at that time: (i) Advanced Engineering, (ii) Electric Utility Application Engineering, (iii) Product Engineering, and (iv) Engineering Planning and Support. The engineers employed in these various subsections were at various levels in G.E.'s exempt salary structure, had differing experience and qualifications and performed different kinds of work on different products. Those in the Advanced Engineering Subsection were responsible for developing and designing new protective relays and systems. Those in the Electric Utility Application Engineering Subsection were responsible for tailoring protective relay system designs to specific customer needs. Those in the Product Engineering Subsection were primarily responsible for designing new relays and modifying existing designs to cover customer needs and providing liaison between the factory and the customers on products cur-

rently in production, including help on maintenance and calibration, and revising designs, factory test instructions, and instruction books as required. Those in the Engineering Planning and Support Subsection were primarily responsible for providing drafting and reproduction services for relay products, and providing engineering program management for development programs.

15. In September, 1974 there were 18 engineers in the Advanced Engineering Subsection and Electric Utility Application Engineering Subsection. They were performing the most sophisticated work in the engineering section of PSMBD. Many of the engineers in these units had begun their employment in entry level engineering positions in the Product Engineering Subsection and had "graduated" to the more sophisticated engineering work in advanced engineering and electric utility application engineering.

16. There were only two engineers in the Engineering Planning and Support Subsection. The other personnel in this subsection were non-exempt personnel who were members of two different collective bargaining units: one IFPTE and one IUE.

17. There were 29 engineers in the Product Engineering Subsection, including plaintiff. Some of these engineers were performing primarily mechanical engineering work; others were performing primarily electrical engineering work. Those performing mechanical engineering work were sometimes, though not always, capable of performing electrical engineering work and vice versa. Each engineer was assigned specific products on which to work, and experience in working on one product (e. g. certain relays) did not necessarily qualify the person to do engineering work on other kinds of products (other relays, static terminals or switches and auxiliary devices). Appendix 1 diagrams the organizational structure of PSMBD, and lists the supervisors of each subsection and the engineers

employed in each unit in late September of 1974. Appendix 1 also sets forth the continuous service date of each employee.

18. Following the decision to lay off two engineers in the engineering section of PSMBD, Lawrence L. Mankoff, the manager of that section instructed the managers of each of the four subsections to rank their engineers in the order of their contribution to the business in accordance with G.E.'s written policy relating to reduction in the exempt work force.

19. Leonard Scharf, Manager of the Product Engineering Subsection had three units within his subsection: (i) static terminals unit, (ii) component relay unit, and (iii) switches and materials unit. The manager of the static terminals unit was James Teague. The manager of the component relay unit was Ernest Stagliano. The personnel in the switches and materials unit were supervised directly by Mr. Scharf.

20. The G.E. policy relating to reduction of exempt work force, in effect in September, 1974, provided:

"1. Review business and manpower needs.

    a. determine the needs of the business.

    b. determine the required positions to meet the business needs.

    c. review the requirements of each position in the component.

    d. review the qualifications of each individual for the remaining positions.

    e. retain those individuals best qualified to fill the positions.

    f. following this review, employees determined to be surplus are to be considered for placement.

2. Criteria to be considered for determination of surplus employees and for their placement include:

a. experience (work history, jobs held, etc.)

b. proven ability (results, skills, adaptability, length of time on current level of work, versatility, etc.).

c. potential for greater contributions and/or responsibilities.

d. service (length of Company service; total and exempt service.)." (Exhibit D–2)

21. Mr. Scharf asked each of the unit supervisors in the Product Engineering Subsection to rank the engineers in their unit in accordance with G.E.'s policy relating to reduction of exempt work force. Mr. Stagliano ranked the engineers in the component relays unit where plaintiff was employed, and plaintiff was ranked at the bottom and John D. Keating, Design Engineer Level 7, was placed second from the bottom.

22. Mr. Scharf subsequently integrated the rankings made by the unit supervisors to produce a ranking of all of the engineers in the Product Engineering Subsection. This ranking placed plaintiff at the bottom and John D. Keating at second from the bottom.

23. Of the engineers in the component relays unit, there were four who had less seniority than plaintiff: Kenneth Geist, John Keating, Robert Koch, and Robert Mentzer. There were two other engineers with approximately the same seniority as plaintiff: David Kiester and William Linhart. The other engineers in the component relays unit had at least two more years of seniority than plaintiff. The six engineers named above were all ranked higher than plaintiff because of their proven ability and potential for greater contributions and responsibility.

24. Specifically, the six engineers were ranked higher than plaintiff for the following reasons:

a. David Kiester, hired by G.E. in January, 1973, was a mechanical engineer and dealt primarily with relays which were mechanical/electrical. Because of this combination of qualifications, he was able to do work which plaintiff, an electrical engineer, could not do. As a consequence, he was much more valuable to G.E. than plaintiff.

b. William Linhart was hired by G.E. in June, 1973. Prior to his employment with G.E., he had had six months experience as a co-op student at Delmarva Power and Light Co. Mr. Linhart was ranked higher than several employees who had more seniority, including two individuals in the static terminals unit who had more than ten years of continuous service. Mr. Linhart was performing work which plaintiff lacked the technical competence to perform and thus was more valuable to G.E. than plaintiff.

c. Robert Mentzer had been hired by G.E. in September, 1974; however, he had been previously employed by G.E. in Utica, New York, from 1952–1959, and had had fifteen years of experience in advanced engineering design with Philco-Ford. He was assigned to the high priority CAIR program, and because of his work experience and knowledge of the CAIR program he was substantially more valuable to G.E. than plaintiff.

d. Robert Koch had been hired by G.E. in June, 1974. By September of 1974, he had demonstrated ability to work with extremely complex and technical relays. Because of his ability to gain competence rapidly in a new technical area, he was judged more valuable to G.E. than plaintiff.

e. Kenneth Geist was hired by G.E. in August, 1974. Although he had been working for G.E. for only six to eight weeks at the time of the rankings, he had demonstrated high technical ability by solving a customer's problem with static relays. Plaintiff had been given a similar problem and was not able to perform at a compara-

ble level. Because of Mr. Geist's demonstration of promise and ability, he was judged more valuable to G.E. than was plaintiff.

f. John D. Keating was hired by G.E. in April, 1974. He had a B.S. and an M.S. degree in electrical engineering. Although Mr. Keating and plaintiff were judged to be approximately equivalent in technical ability, plaintiff could not do the work that Keating was doing without seriously impairing the efficiency of the unit. Thus, Mr. Keating was judged more valuable to G.E. than was plaintiff.

25. In September, 1974 the individuals working in the component relays unit were all doing work which plaintiff did not have the technical competence to perform as efficiently as these other individuals. Many of them were doing work which plaintiff did not have the technical competence to perform at all. Others were doing work which plaintiff could have learned to perform but only after an extensive period of time.

26. Plaintiff, on the other hand, in September, 1974 was performing work which each of the other individuals in the component relay unit, with the exception of Mr. Mentzer and Mr. Kiester, was technically competent to perform and could have performed without any significant loss of efficiency. Mr. Mentzer and Mr. Kiester were not technically competent to perform the work done by plaintiff because they had been trained as mechanical engineers, not electrical engineers.

27. When Mr. Scharf integrated the rankings made by the unit supervisors to create one ranking for the entire Product Engineering Subsection, he judged the individuals in the static terminals unit to be more valuable to the overall business needs of the subsection because of the extensive involvement of the static terminals unit with filling specific customer orders. Thus, all of the static terminal engineers as a whole were given a higher ranking than the

component relays engineers. The three engineers ranked lowest on the integrated ranking were, therefore, from the component relays unit.

28. The ranking of exempt employees in the Product Engineering Subsection later was integrated by Mr. Mankoff, Mr. Scharf and the other three subsection managers in the Engineering Section of PSMBD with the rankings of exempt employees in the Advanced Engineering, Electric Utility Application Engineering and Engineering Planning and Support Subsections.

29. G.E.'s criteria for ranking its employees were clearly defined, work related, and capable of being applied in a nondiscriminatory manner.

30. G.E.'s criteria for ranking its employees were applied in a nondiscriminatory manner in respect to plaintiff. Plaintiff was ranked below other individuals in the Engineering Section of PSMBD on the basis of G.E.'s business needs, and on the basis of the experience, proven ability, potential for greater contributions and responsibility, and service of the other individuals.

31. Plaintiff's low ranking was premised primarily upon his relative lack of technical capability and relative inability to gain competence in new technical areas. A factor of lesser importance was plaintiff's relative difficulty in oral and written communication of technical matters. This difficulty in communication was attributable to plaintiff's lack of broad product knowledge and difficulty in using technical relay language. Plaintiff's difficulty in communication was not attributable to plaintiff's accent.

32. Plaintiff's national origin, race, or color were not factors in his ranking.

33. G.E. employed two forms for purposes of evaluation of employee performance, the CMMD form and the SC1043 form. The CMMD–2 and CMMD–3 forms are not designed to contain comprehensive

evaluations of the performance of individual employees. Rather, these forms are partially completed by the employee himself and reflect his career goals and objectives and his supervisor's comments with regard to these goals. In February, 1974, after plaintiff had been on the job for three months, plaintiff and his supervisor, Mr. Stagliano, completed one set of forms CMMD–2 and CMMD–3.

34. Form SE1043 is used by G.E. to make a comprehensive evaluation of an individual's performance. In July, 1974 plaintiff's immediate supervisor, Ernest Stagliano, met with plaintiff to agree on the specific projects upon which plaintiff's performance would be evaluated. The form used for this purpose was the SE1043 form. Plaintiff and Mr. Stagliano agreed that each of the projects which were to form a basis for plaintiff's evaluation would be given equally high priority in making the evaluation. Because plaintiff was laid off in the fall of 1974, he did not have an opportunity to complete those projects and as a result the Form SE1043 was never completed.

35. Plaintiff received a lay off notice from G.E. signed by Leonard Scharf, on or about September 27, 1974, to be effective October 15, 1974. At the time of plaintiff's lay off notice another of the engineers, John Keating, was also notified that he was laid off. Following receipt of his lay off notice plaintiff suggested to Ernest Stagliano that his lay off date be delayed one month so that plaintiff would have one full year of employment with G.E., and this was done.

36. On October 25, 1974, David J. Keister notified G.E. that he was resigning his employment at G.E. and accepting another position elsewhere. Mr. Keister's resignation created a vacancy.

37. Mr. Mankoff, Mr. Scharf and Mr. Stagliano decided to offer Mr. Keister's position to Mr. Keating. Mr. Keating was ranked higher than plaintiff based upon all of the criteria in G.E.'s policy. In addition, Mr. Keating had more qualifications and experience in mechanical engineering than plaintiff, and was better able to fill the position vacated by Mr. Keister.

38. Subsequent to November, 1974, further reductions of exempt employees in the Engineering Section of PSMBD occurred as follows:

(a) Kenneth Geist—laid off in March, 1975.

(b) Leo Tenshaw—laid off in March, 1975.

(c) Bruce DiRienze—laid off in March, 1975.

(d) Sandor Mentler—resigned in June 1975 and not replaced.

(e) Fred Treaster—resigned in January, 1976.

(f) James DeLacey—laid off in April, 1976.

(g) Hilliard Sorokin—resigned in December, 1976.

(h) Robert Koch—resigned in January, 1977 (took a position with G.E. in Ohio)

39. No new employees have been added to the Engineering Section of PSMBD since November, 1974, except for Robert DePuy, an employee with twenty-five (25) years service with G.E., who was moved into the Advanced Engineering Subsection to work on a special new project on digital electronics.

40. The total number of exempt employees at G.E.'s Philadelphia works, 6901 Elmwood Avenue, Philadelphia, Pennsylvania, in September, 1974 was 1,244. By December 31, 1974 G.E. had reduced the total number of exempt employees to 1168. By December 31, 1975 these numbers had been further reduced to 944. As of December 31, 1976 G.E. had 780 exempt employees at the Philadelphia Works.

## DISCUSSION

This case presents the question of whether G.E., when faced with the necessity of laying off several employees because of unfavorable business conditions, discriminated on the basis of race, color, or national origin in deciding to lay off plaintiff Ravindra Nath. Plaintiff was not dismissed because of absenteeism, insubordination, or gross incompetence; rather, he was dismissed because he was judged to be less competent than other employees. Thus, it is especially important in this case to examine carefully the criteria used by G.E. in ranking its employees for purposes of the lay off.

■ The allocation of the burden of proof in a private employment discrimination case was set forth by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under *McDonnell Douglas*, the plaintiff is required to carry the initial burden of establishing a prima facie case of discrimination on the basis of race, color, or national origin. The burden then shifts to the employer "to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at 802, 93 S.Ct. at 1824. Once this is accomplished, the employer has rebutted the plaintiff's prima facie case, and in order to carry his burden the plaintiff must show that the defendant's articulated reason was mere pretext. *See Walton v. Eaton*, 563 F.2d 66 n.9 (3d Cir. 1977).

■ Plaintiff relies heavily on the contention that the criteria used by G.E. were "subjective". Although it is true that the use of subjective criteria may open the door to more subtle types of discrimination, the use of subjective criteria is not per se a violation of Title VII. *Rogers v. International Paper Co.*, 510 F.2d 1340, 1345 (8th Cir.) vacated on other grounds, 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975); *Hester v. Southern Railway Co.*, 497 F.2d 1374, 1381 (5th Cir. 1974). In all fairness to G.E., no one would seriously contend that an evaluation of the relative ability of design engineers could be made solely on the basis of completely objective criteria, such as years of service with G.E. and educational level. An evaluation of technical ability is necessarily based on factors that are not purely objective.

■ Nevertheless, use of subjective criteria is open to attack where the criteria are vague and unrelated to the qualities necessary for successful on-the-job performance. *See Rogers v. International Paper Co., supra; Rowe v. General Motors Corporation*, 457 F.2d 348 (5th Cir. 1972); *Brown v. Gaston County Dyeing Machine Co.*, 457 F.2d 1377 (4th Cir.) *cert. denied*, 409 U.S. 982, 93 S.Ct. 319, 34 L.Ed.2d 246 (1972). A distinction must be made between such vague, subjective criteria, and criteria which, although subjective, are job-related, clearly defined in terms of the competences to be measured, and capable of being applied in a nondiscriminatory manner. We conclude that G.E.'s criteria are of the latter kind.

■ Looking to the criteria themselves, two of the factors—"experience" and "service"—are clearly objective. One of the remaining criteria, "proven ability," specifies the factors which are to be considered in making an evaluation, which are "results, skills, adaptability, length of time on current level of work, versatility, etc." These factors are clearly defined and job-related. The third criteria, "potential for greater contributions and/or responsibilities," while certainly a valid, job-related factor, presents a possible problem in measurement, i. e., how can "potential" be measured? However, the testimony of Mr. Stagliano establishes that judgments here were based on past performance; in other words, employees who had demonstrated good skills, adaptability, etc., in the past were presumed to have the potential to do so in the future. Thus, we conclude that the evidence establishes that the criteria used by G.E. were clear, job-related, and capable of being applied in a nondiscriminatory manner.

Finally, plaintiff has failed to show that these criteria were merely a pretext. The testimony demonstrates that Mr. Stagliano fairly and conscientiously applied the criteria in making his ranking. Plaintiff's race, color, or national origin were not a factor.

In sum, plaintiff here has established his prima facie case. However, G.E. has been able to articulate nondiscriminatory criteria used for the ranking of the employees in the Product Management Subsection which resulted in the dismissal of plaintiff. This suffices to meet plaintiff's prima facie case unless plaintiff can demonstrate that the criteria used were mere pretext. This plaintiff has failed to do.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter of this action under 42 U.S.C.A. § 1981 and Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e *et seq.*

2. This Court has jurisdiction of the parties.

3. Defendant General Electric Company is an "employer" within the meaning of Title VII of the Civil Rights Act of 1964.

4. Plaintiff must, in order to sustain his burden of proof, establish by a preponderance of the evidence that G.E. impermissibly considered his race, color, or national origin in determining the ranking of employees in the PSMBD division.

5. G.E.'s articulated criteria for ranking employees were clearly defined, job-related, and nondiscriminatory.

6. G.E. fairly applied their articulated criteria in arriving at their ranking of employees.

7. G.E. did not discriminate against plaintiff on the basis of his race, color, or national origin in violation of 42 U.S.C. § 1981 or Title VII of the Civil Rights Act of 1964.

## APPENDIX A