NAACP, Alcorn County Branch, Hazel Garner and Willie Beavers, Plaintiffs,

v.

**CITY OF CORINTH et al., Defendants.**

**No. EC 76–245–K.**

United States District Court,
N. D. Mississippi, E. D.

May 3, 1979.

James O. Ford, Kenneth Mayfield, Tupelo, Miss., for plaintiffs.

Robert G. Krohn, W. C. Sweat, Jr., Corinth, Miss., for defendants.

## MEMORANDUM OF DECISION

KEADY, Chief Judge.

On December 21, 1976, the individual plaintiffs, Hazel Garner and Willie Pearl Beavers, together with the organizational plaintiff, Alcorn County Chapter of the NAACP, filed this class action alleging racial discrimination by the City of Corinth, Mississippi, its mayor and members of the board of aldermen in the hiring practices of the city's fire, police and administrative departments, in violation of 42 U.S.C. §§ 1981 and 1983, and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. as amended. Jurisdiction is invoked under 28 U.S.C. § 1343(3) and (4) and 42 U.S.C. § 2000e–5(f).

On December 1, 1977, the court conditionally certified the case as a Rule 23(b)(2) class action for the benefit of all black citizens of Corinth allegedly injured by the city's racially discriminatory hiring practices.

After extensive discovery, interrogatories, requests for admission of facts and stipulations contained in a pretrial order, the court conducted a two-day evidentiary hearing, commencing March 29, 1979. On motion of plaintiffs, the court bifurcated the issue of liability for trial, reserving damages for future determination. The parties have submitted legal memoranda as well as proposed findings of fact and conclusions of law. The case now being ready for final determination, we proceed to make findings of fact and conclusions of law as required by Rule 52, F.R.Civ.P.

## I. BACKGROUND FACTS

(a) *The city's racial composition and governmental organization.*

The city has a population, according to the 1970 official census, of 11,581, approximately 19% of which is black. It is located in and is the county seat of Alcorn County, which has a black population of about 11%. Of the city's total employable population between the ages of 20 and 54, 4,606 (86.6%) are white and 717 (13.4%) are black. Pursuant to a special charter, the city operates under a mayor and board of aldermen form of government. Elected officials are the five aldermen and the mayor, who presides at the board's meetings. The mayor and board hire all municipal employees, other than the chief of police, who is an elected official.

In accordance with the pretrial order and the stipulations of counsel before the court, our concern relates to the city's hiring practices in only three areas: namely, the fire, police and administrative departments. Plaintiffs also concede that they have no complaint about the hiring practices in the other municipal departments. Moreover, plaintiffs make no contest about promotions and transfers in the three departments under review.

On March 7, 1966, the city adopted an ordinance providing minimum qualifications for the employment of policemen and firemen, consisting generally of requirement for "high school education or its equivalent;[1] aptitude for investigational work; some knowledge of mechanics of motor driven equipment; the ability to make written reports; keen power of observation; courtesy, loyalty; emotional stability; neat appearance and good speech; high moral standards and integrity." Minimum height and weight requirements were specified. The ordinance provided, however, that the provisions might be waived by the mayor and board by unanimous vote in case of exceptional qualifications or emergency conditions. This ordinance was further amended in July 1975 to require that all policemen and firemen during the period of their employment shall reside within the municipal corporate limits. Even though the amendment did not provide for a "grandfather clause" or exemption for firemen and police officers then living outside the city, the additional requirement was never applied to them, with the result that at least 5 firemen and 3 police officers hired before the amendment of the ordinance, continue to be employed by the city and resided outside the city limits.

(b) *Employment policies and practices in general.*

Prior to the commencement of this action, the city had no requirement for advertising vacancies; word of forthcoming vacancies was orally communicated in the community. Historically, no blacks had been employed in the city's fire, police, and administrative departments. The first black was not hired in the fire department until December 1974; however, two blacks had been employed as police officers as early as 1963 but were assigned to black neighborhoods, and their powers limited to the arrest of black persons only. Written applications for employment were instituted by the city at some date prior to 1970. All applications for initial hire were filed with the city clerk, Luke Wood, a long-time employee, who testified that the hiring procedures in Corinth have remained virtually unchanged since 1965. Applications were not required of former employees who resigned or left the city's employment for other reasons and then sought reemployment. According to Wood, it was customary, when a vacancy occurred, for the department head to request to see all applications on file in the clerk's office; the department head considered as many such applications as he thought were qualified and recommended the number to appear before the aldermanic board, which had the ultimate authority, with the consent of the mayor, to hire an applicant. Prior to employment, it was usual for the applicant or applicants recommended by the department head to be interviewed by the board. No black had ever been employed as city clerk, as tax collector, or as a department head. Neither had a black ever been employed as a captain or lieutenant on the fire or police force. Until 1974, no black had ever been elected to the board of aldermen.

Mayor John Mercier, in office since October, 1962, and E. S. Bishop, a black educator later elected to the post of city alderman, in the early 1960's met and collaborated with local black leaders for the purpose of establishing community rapport; as a result of this dialogue, two black police officers were first hired in 1963. This informal committee of community black leaders continued to function until 1967 and made recommendations to the board for hiring in special projects, such as the Urban Renewal Agency and Community Development, and similar projects, both federally and locally funded, which provided employment to young blacks, particularly young women as secretaries and young men as administrators, during the limited life of these special undertakings. A black, Alton Thompson, served as director of the Urban Renewal Program. In 1967, the local chapter of

---

1. In addition, "applicant shall have successfully completed the eighth grade of a duly accredited public school."

NAACP was revitalized, and some of the earlier black leaders participated in the local chapter, which assumed the function of recommending blacks to the city for employment and for appointment to city boards. The mayor testified that despite his efforts to induce qualified blacks to apply for employment with the city, this was difficult to accomplish because of higher paying industrial jobs which existed within the Corinth community.

Mayor Mercier further testified that during this early period the city administration made no efforts of its own to recruit blacks for municipal employee positions, but relied exclusively on Bishop and his committee of black leaders for recommendations. According to Mercier, the city never failed to hire the blacks who were recommended by this committee; other blacks were hired as well, but Mercier felt that the employment "track record" was better with those blacks recommended by the committee. According to the mayor, blacks have for many years been appointed to serve on various city commissions.[2]

E. S. Bishop, a black who was elected in 1974 and since reelected, testified as to his role in the city's hiring of blacks in the 1962–74 period. He was of the view that, though improvement for blacks in some areas was achieved by the efforts of the informal committee and later the NAACP, the rate of blacks being hired by the city, other than in the police department, "wasn't as rapid as we had wished." Though Bishop was offered as a defense witness, he reluctantly conceded that "some" racial discrimination in the employment of blacks by the city had occurred before he took office. Since his election, Bishop stated that both the number of black applicants and of blacks hired had significantly increased, a circumstance which he attributed to the existence of a militant group of young blacks interested in city government and to

his own election, twice, to the board of aldermen with its consequent impact upon the black community.

## II. FACTUAL ASPECTS OF RACIAL DISCRIMINATION

(a) *Statistical characteristics of employment of personnel in the city's fire, police and administrative departments.*

Prior to 1963 no blacks were employed by the city as firemen, policemen or in any administrative departments. By 1968, no blacks, other than the two black police officers who had been employed in 1963, were hired in the police, fire and administrative departments. The evidence does not show the total work force in the fire, police and administrative departments; only the number of applicants and their race for the years 1968 through 1977 were disclosed to the court.

On April 9, 1974, Alcorn County Chapter of the NAACP filed a charge with the Equal Employment Opportunity Commission (EEOC) on behalf of blacks as a class and individually charging that the city had discriminated against blacks in the employment of various departments.[3] The EEOC investigation revealed that the city had a total employment roster of 157 people, of whom 128 were white males (81%), 15 were white females (10%); that 14 (9%) were black males employed in the street department, sewage, park custodian, with the exception of a single police officer out of a force of 20 officers; that no blacks had ever been employed in the fire department, nor had black females been employed by the city in any capacity. EEOC further concluded that the hiring of only one black police officer and no black firemen or black administrators, considering the percentage of the black employable population within the municipality, implied the existence of a

---

**2.** Blacks presently serve on the school board, Housing Authority, Parks and Playground Commission, Library Commission, and Cemetery Advisory Committee.

**3.** The NAACP charge, and the EEOC investigation, involved all facets of city employment, including streets, sanitation, parks, gas and water department, as well as the three departments (fire, police, and administrative) which are the subject of this litigation.

pattern or practice of racial discrimination. This conclusion was reinforced by vacancies being filled largely by word of mouth referral by present employees and the absence of a recruitment policy within the black community.

After the filing of the charge of discrimination, the city began to advertise notice of job vacancies in the local newspapers and, as will be noted below, its hiring of blacks as firemen, policemen, and in administrative capacities materially increased. At trial, counsel for the plaintiffs conceded that since the filing of this action in 1976, the city has hired substantial numbers of blacks in the three departments under consideration, even though Corinth has not officially adopted an affirmative action program.

As gleaned from the city's total hirings in police, fire and administrative positions for the 1968–77 period and an analysis which defendants submitted, the following statistical data emerges:

1. While no data is available for the number of black and white applications for 1968, the city that year hired 15 whites and 2 blacks in the police department and 6 whites and no blacks in the fire department; also, one white was employed as housing inspector; no blacks were hired in an administrative capacity. Thus, the total hirings for this particular year were 22 whites and 2 blacks.

2. Similarly, the number of applications received by the city during the years 1969 is not disclosed by the evidence. Seven whites and no blacks were hired as police officers, and 3 whites and no blacks were hired as firemen. Thus, total 1969 hirings were 10 whites and no blacks.[4]

3. During 1970, 13 whites from 39 white applicants were hired (33%), but none of the 4 black applicants were hired (0%). These figures reflect a total for all applicants for police, fire and administrative positions with the city. Statistics for the years which follow were computed in a similar manner.

4. During 1971, 14 of 34 white applicants were hired (41.2%), while 2 of 7 black applicants were employed (28.5%). The two blacks were hired as policemen.

5. During 1972, a total of 27 out of 58 white applicants in the three departments were hired (46.5%), while 2 of 6 black applicants were employed (33.3%). The two blacks again were hired as police officers.

6. During 1973, 22 of 70 white applicants were hired (31.4%), while none of the 4 black applicants were hired.

7. During 1974, 18 of 173 white applicants were hired (10.4%), and 3 of the 29 black applicants were employed (10.3%). Of the 3 blacks, one was hired as a police officer and 2 were hired (the first ever) as firemen.[5]

8. During 1975, 8 of 79 white applicants were hired (8.2%), and one out of 41 black applicants was hired (2.4%). The one black was hired as a fireman.

9. During 1976, 10 out of 137 white applicants were hired (7.3%), and 5 out of 19 black applicants were employed (26.3%). All of the blacks were employed as police officers.

10. During 1977, 9 of 130 white applicants were hired (6.9%), while 9 of 25 blacks were hired (36%). Of the blacks hired, 4 were policemen, 4 were firemen, and one was apparently employed in an administrative position.

The latest available figures for the current year 1979 show a work force in the police department of 35, of whom 9 are black (25.7%) and 26 are white (74.3%); in

---

4. Of the whites hired in 1969, one was an "extra," and not a regular, employee.

5. Total hired for the years 1972 to 1975 (inclusive) are tabulated as follows:

Police Department: 46 of 181 white applicants hired (25.4%); 3 of 38 black applicants hired (7.9%).

Fire Department: 21 of 111 white applicants hired (18.9%); 3 of 29 black applicants hired (12.5%).

Total applications for fire, police, and administrative positions during this period reveal that 75 of 380 white applicants were hired (19.7%), while 6 of 80 black applicants were hired (7.5%).

the fire department the workforce is composed of 8 blacks (21.0%) and 30 whites (79.0%). Two blacks (11.1%) and 16 whites (88.9%) are currently employed in the city administrative department. The overall percentage of blacks presently employed in the three departments is 21%.

### III. THE NAMED PLAINTIFFS

#### (a) *Hazel Garner.*

Hazel Garner, who currently lives in Memphis, was graduated from the Corinth High School in 1959. Her work experience at the time of her application included operating various types of machines for industries within the Corinth area. She first applied orally to Chief of Police Fisher Watkins in June 1975 for the desk dispatcher or metermaid. Watkins informed her that the city was not hiring at that time because of lack of funds, nor did Garner know whether a vacancy then existed. However, in October she filed a written application at the police department, again unsure if a vacancy existed at that time.[6] In any case, she was never contacted by the city nor called in for an employment interview. On March 8, 1976, she applied the third time, by written application for the job of desk dispatcher, listing an address outside the Corinth city limits. Garner was never contacted by the city. At trial, she testified that she would have moved into the city to comply with the residency requirement then in effect. It appears uncontradicted, however, that Catherine West, a black, was, on March 8, 1976, hired as a part-time dispatcher, and put on full-time status July 19, 1976. Bernice D. Sprouse, a white, was also hired as a police dispatcher on July 19, 1976, and Patricia Lambert, a white, was hired as relief dispatcher on the same day. The city contends that Garner was disqualified at the time of all of her applications because of her residency outside the city limits, in violation of the ordi-

nance which had been adopted in July 1975. However, it appears that at least 8 firemen and policemen, all of whom are white, resided outside the city under the benefits of the so-called "grandfather clause," a provision not contained in the ordinance as written.

#### (b) *Willie Pearl Beavers.*

Willie Pearl Beavers, a lifelong resident of Corinth, completed the 10th grade in the Corinth public schools. In 1970, she applied for the position of safety patrolwoman with the police department after learning of a vacancy in that department from a black police officer. She conferred with Chief of Police Art Murphy, who confirmed that a vacancy existed and advised her to fill out an application. No particular qualifications were mentioned. She was never contacted for interview and did not check back with the chief of police. Meanwhile, three vacancies occurred in the position of safety patrolwomen and three whites, Marcia Nelms, Janell Mullins and Gladys Flanagan, were hired in 1970 as safety patrolwomen. In 1973, Ms. Beavers applied for the same position, with similar results.[7] When a resignation occurred in October 1973, a white woman, Ms. Anna Jackson, was, on that same date, hired to fill the vacancy. Ms. Beavers applied for a third time on August 26, 1974, seeking employment as a safety patrolwoman or for "anything else that was open." She signed written application at the mayor's office and was advised that they would get in touch with her when a job became available. No word, however, was received by Ms. Beavers. Ms. Beavers returned to the mayor's office and applied to the secretary, but never heard from her application. While she did not check back, it was learned that these jobs were later filled by the rehire of a former white employee and by Minnie Sorrells, a black. Both of these persons were hired October 21, 1974.

---

**6.** Although the city disputes that Garner applied prior to March 8, 1976, we find as a fact that she did apply, orally in June 1975, and in writing in October 1975.

**7.** No record of Beavers' 1970 and 1973 applications were produced at trial. Although the city contends that all applications made were preserved, we find as a fact that Beavers did apply on both occasions.

## IV. THE CLASS MEMBERS

Of the eighty-three purported class members who filed written job applications, twelve testified: Milus H. Copeland, Laverne Copeland, Robert Copeland, Robert White, Larry Wade, Louis Crawford, Mary E. Alexander, Larry Betts, Quance Crenshaw, John Swinney, Tommy Swinney, and Terry Coleman, Jr.

### (a) *Milus H. Copeland.*

Milus H. Copeland, who had resided in Corinth for 22 years and was a leader in the local chapter of the NAACP and active in community affairs, applied in July 1976 for the position of city clerk. Copeland, a college graduate, had two years of experience in the military service performing administrative duties. According to a news story which appeared in a local newspaper, Luke Wood, incumbent city clerk, submitted a letter of resignation to the city in August 1976. This caused Copeland to apply for the position. Copeland testified he later learned that Wood was rehired by the city about 30 days following his resignation. Copeland stated that he received no explanation for the way in which his application for city clerk was ignored and how the city went about retaining Wood's services. The fact of the matter was that Wood, who had been city clerk since 1965, did submit his resignation in April 1976, but it was not accepted by the mayor and board of aldermen. The differences between the city clerk and the administration were resolved so that for a period of twelve weeks Wood divided his time between working as city manager for Adamsville, Tennessee, and holding down his position as Corinth's city clerk. The latter duties he performed part-time until August 1, 1976, when he resumed full-time employment with the City of Corinth. The court finds as a fact that under these circumstances no vacancy has ever occurred in the position of city clerk; Milus H. Copeland's application was, therefore, not entitled to be considered.

### (b) *Laverne Copeland.*

Laverne Copeland, a longtime resident of Corinth, applied November 13, 1975, for the position of secretary to the mayor, having learned of an impending vacancy through Alderman E. S. Bishop. She executed her application in writing and gave it to Mr. Wood, the city clerk. For personal reasons, the incumbent secretary who had intended to resign, delayed the termination of her employment for a substantial time, thus postponing the expected vacancy in this job. Admittedly, Ms. Copeland was highly qualified for the position and had held responsible employment with Tyrone Hydraulics, a local industry which had laid her off temporarily. The city clerk, who was favorably impressed with her qualifications, recommended consideration of her application. Meanwhile Ms. Copeland was recalled to her former employment by Tyrone Hydraulics; on February 9, 1976, she returned to her old job. The evidence reveals that the city clerk, after the secretarial vacancy occurred, called Ms. Copeland to determine her availability for work and he was advised by her mother that Ms. Copeland had returned to work at Tyrone Hydraulics. Neither Ms. Copeland nor her mother, who failed to testify, refuted Wood's testimony as to his telephone call. Ms. Copeland never responded to the city clerk's call. Subsequently, in October 1976 and in March 1977, Mattie Harris Gaines and Barbara Walker, both black, were hired as secretaries at the city hall. These were the first hires as administrative personnel after Copeland's application.

### (c) *Robert Copeland.*

Robert Copeland, brother of Milus H. Copeland, graduated from high school in Corinth in 1963. He had three years of college at Mississippi Valley State and Jackson State, and after moving to Chicago in 1966, he attended a General Motors training school. He held employment as a bus driver and as a chemist for Sherwin-Williams. Returning to Corinth in November 1972, he applied the next month for the position of patrolman. He had been informed by Chief Murphy that a vacancy existed, and, according to Copeland, Murphy encouraged him to apply. Thus, Copeland filed a written ap-

plication at that time although the city questions that he applied at the city hall, because of the failure to produce a written application. Nevertheless, the city continued to take applications for police vacancies. On two separate occasions in January and February 1973, Copeland approached the chief to check on the status of his pending application. Both times Murphy assured him that his application would receive every consideration. However, Copeland was never contacted by the city, and in April 1973, he secured employment at Southbridge Plastics as an assistant research chemist. Copeland testified that he met all requirements for a Corinth police officer. The evidence shows that on December 4, 1972, three vacancies existed in the police force, and Charles Barnett, a black, and Roger Hilburn and Danny Childs, both white, were hired to these positions. On January 2, 1973, a patrolman by the name of C. B. Wright resigned. Twelve days later, two whites, James Wilburn and Roy Crum, Jr., were rehired, and Willie H. Brewer and Verrell Miller were hired. Robert Copeland was never called in for interview nor apparently given any consideration to fill any of the vacant positions which were created after his application.

### (d) *Robert White.*

Robert White, a lifelong resident of Corinth, is presently employed by Tyrone Hydraulics as a mill operator. White attended public school in Corinth and completed the eleventh grade. In 1964 he was hired by the city as a junior high school janitor. In December 1967, he applied for a job with the police department after having talked with Chief Murphy and learning that a vacancy existed. According to White, the city continued to receive applications and ultimately hired a white person. White said that Chief Murphy told him that he would contact him for interview but never did. The record shows that the city rehired J. C. Gaines, the black police officer who had resigned, and, in addition, hired several white applicants. White, in May 1972, reapplied to the city upon learning that the city was hiring police officers and again

talked with Chief Murphy, who advised him to fill out an application. The chief told him that there would be an opening but did not explain why he had not been previously called in for a job interview. White affirmed that several whites were hired as police officers in 1972, after his second application. The record shows that between June and October 1972, at least 11 whites were hired or rehired as police officers and 1 black was hired and 2 were rehired after White's application was on file. White was never interviewed nor given any reason why he did not receive employment. He testified he was still interested in working for the city if the compensation were adequate. He testified that each time he applied, Chief Murphy told him that he had been passed over. Although White is now making excellent wages in his present industrial job, he would have been, in 1972 and 1973, very interested in receiving a policeman's pay. The city contends White was a functional illiterate, and disqualified to hold the job of police officer. Plaintiffs demonstrated that White's ability to read and write approximated that of two white police officers, Blakely and Miller, both of whom were hired in 1973.

### (e) *Larry Wade.*

Larry Wade, who had lived at Corinth for eight years and had an eleventh grade education, applied at the city hall on May 22, 1972, for any job that was available. He testified that after he had applied he learned that several whites were subsequently hired. Wade was never called in for an interview, although upon applying he was told that if any opening came up he would be called. He was interested in employment as either a policeman or fireman and testified that he thought he was qualified for either position. As in the case of Robert White, numerous white applicants were hired as firemen and policemen subsequent to his application; two black applicants were also hired as police officers.

### (f) *Louis Crawford.*

Louis Crawford, who lived in Corinth for ten years and had a seventh grade educa-

tion, applied for the position of police officer on November 8, 1971. According to oral information that he received, there was a vacancy in the police department which was not advertised. He testified no effort was ever made to recruit blacks for police officers or to serve in the fire department. Although he made an application, he was not employed, three whites and one black were hired shortly thereafter. He was told that his application would be good as long as it was on file. Chief Murphy said he would be called in the event of a vacancy but this never occurred. Crawford stated that at the time he applied, there were no blacks working either as firemen or police officers. The record shows a considerable turnover of both whites and blacks consistently occurred in the police department. Some turnover also occurred in the fire department, but with less frequency than in the police department.

### (g) Mary E. Alexander.

Mary E. Alexander testified that in July 1970 she applied in writing at the city hall for the position of safety patrol and talked to Mayor Mercier about the opening. She stated she was told there was a vacancy and that the mayor said the board of aldermen would meet the next Monday night to act upon the matter, and that she would be notified thereafter of the board's decision. According to Ms. Alexander, she was never notified. When she contacted the city hall some time later, she learned that a white person had been rehired for the position. The record shows that in October 1970, two safety patrol women, Janell Mullins and Gladys Flanagan, both white, were hired.

### (h) Larry Betts.

Larry Betts, a native of Corinth, first applied in June 1974 for the position of police officer; at that time he was only twenty years old and thus disqualified for the job. After becoming 21, he was first hired as a policeman under the CETA program; later he became a full-time, permanent police officer, a capacity in which he still serves. He maintained that half of the police force lacked a high school education and could not meet the requirements specified in the city's ordinance.

### (i) Quance Crenshaw.

Quance Crenshaw, a resident of Corinth, had graduated from the Corinth High School, had two years of college, and had served ten years in the army, attaining the rank of sergeant first class. During his military service, although not an M.P., Crenshaw had received riot training and had done work in Chicago to quell disturbances in that city. On August 31, 1973, and September 5, 1973, he applied for "city dog catcher" and later as fireman and police officer. He was called for an interview by the board of aldermen along with two white applicants. Chief Dees, who was acting chief of police after the death of Art Murphy, advised him that there would be more hirings, and Crenshaw hoped to get employed at some time. The record shows that between September 1973 and December 1974, three new patrolmen, all white, were hired by the city, and that another white was rehired. Crenshaw's only employment with the city was at the municipal library where he worked four weeks for Mrs. Richardson, the librarian. He was hired to replace a white janitor; when the white janitor returned to work, Crenshaw was terminated.

### (j) John Swinney.

John Swinney, who had resided for many years at Corinth, had a ninth grade education, and at the time of trial had been employed for eight years at Tyrone Hydraulics. On August 11, 1970, he applied for a job in the fire department by filing a written application. He had been informed that a vacancy existed by the city engineer, James Dunaway. On several occasions, Swinney returned to check on the status of his application with Chief Stevens, then in charge of the fire department, but he was never called for an interview. He affirmed that as of 1970 no blacks had ever been hired by the fire department. He feels that he was qualified for the job but was discri-

minated against on account of his race. However, the record shows that no vacancies occurred in the fire department after Swinney filed his application, nor were any new hires made in that department during the remainder of 1970 or in 1971.

### (k) *Tommy Swinney.*

Tommy Swinney, a resident of Corinth and a high school graduate, applied May 22, 1972, for any job that was available. He talked to City Clerk Luke Wood about vacancies. He testified that no blacks were employed as policemen or firemen or administrators at the time of his first application. When he checked back with the clerk, he learned that white applicants had been hired in 1974. During the interval, numerous whites were hired as police officers and firemen; and three blacks, including a safety patrolwoman, were hired as police officers. On June 12, 1974, Swinney reapplied for a fireman's job. He testified that when he later checked back on his application, he learned that white applicants had been hired to fill the vacancies. The record shows that between June and September 1974 seven whites were hired as firemen but no blacks received such employment. It is uncontradicted that in 1974 a third shift was added to the fire-fighting force.

### (1) *Terry Coleman, Jr.*

Terry Coleman, Jr., had resided in Corinth for 18 years and finished high school in 1965. He served three years in the United States Army and at the time of trial was employed by Southbridge Plastics. In April 1974, he applied with the city for the position of fireman, feeling that he was qualified for such position. He never heard from the city. Coleman testified that another black, Tommy Porter, applied about the same time. The position, however, was filled by a white. The record reveals that, as in the case of Tommy Swinney, numerous whites were hired as firemen in the summer and fall of 1974, subsequent to Coleman's application. The city contends

that this applicant was on strike at Southbridge Plastics and was not genuinely interested in obtaining a job with the city.

## V. APPLICABLE LAW

### (a) *Jurisdiction.*

The complaint alleges causes of action under Title VII as well as 42 U.S.C. §§ 1981 and 1983. Unquestionably, 28 U.S.C. § 1343(3) and (4) provide a jurisdictional base for the § 1981 and § 1983 claims.

Jurisdiction of the claims asserted under Title VII, however, is more restrictive and dependent upon compliance with two essential prerequisites. First, a charge must have been filed with the EEOC within 180 days of the alleged discriminatory act. This condition may be met by the filing of a charge by an organization for its members, and the charge need not be filed by one or more members, 42 U.S.C. § 2000e–5(b); 29 C.F.R. § 1601.6. This prerequisite was satisfied by the Alcorn County Chapter of the NAACP filing a charge against the city of class discrimination on April 9, 1974. Second, suit in federal court must be filed within 90 days of the receipt of a "right-to-sue" letter from EEOC. Here suit was filed on December 31, 1976, or within 90 days of the receipt of the right-to-sue letter on October 4, 1976. Thus both Title VII jurisdictional requirements were met. *East v. Romine, Inc.,* 518 F.2d 332, 336–7 (5 Cir. 1975).

### (b) *Class action maintainability.*

It is well established that a Title VII plaintiff may bring a class action on behalf of those members who have not filed charges with EEOC and that such charge tolls the running of the 180-day limitation period for all members of the class. *Wetzel v. Liberty Mutual Ins. Co.,* 508 F.2d 239, 246 (3 Cir. 1975), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975); *Oatis v. Crown Zellerbach Corp.,* 398 F.2d 496, 499 (5 Cir. 1968).[8] However, the Title VII plain-

---

8. It is less clear, however, that any organization, other than EEOC, has "standing" to main-

tain a Rule 23 class action as class representative. *See EEOC v. D. H. Holmes Co., Ltd.,* 556

tiff on whose behalf an EEOC charge has been filed may not properly include in the plaintiff class alleged discriminatees whose claims may be time-barred at the time of the filing of the EEOC charge, by the 180-day limitation. Such persons could not be counted as members of the class for the purposes of Title VII relief. *Wetzel, supra; Wilhite v. South Central Bell Tel. & Tel. Co.,* 426 F.Supp. 61–65–66 (E.D.La.1976) (per Rubin, J.). The fact that claims of some members of the plaintiff class under Title VII may be time-barred affects only the relief grantable under Title VII and does not destroy the maintainability of the class as a Rule 23 class action, since the evidence shows that the plaintiff class, for purposes of §§ 1981 and 1983 liability, consists of 83 purported class members who applied for employment with the city's fire, police and administrative departments and were allegedly passed over, or discriminated against, because of race. We find that the suit satisfies all requirements of Rule 23(a) and is maintainable under subsection (b)(2). We need not be concerned with the question of reducing the size of the putative class because of any applicable statute of limitations to the § 1981 and § 1983 claims since the defendants have failed to plead in their answer the statute of limitations as an affirmative defense, as required by Rule 8(c), F.R.Civ.P. When limitations are not affirmatively pled by a party, the defense is waived. *Dunn v. Koehring Co.,* 546 F.2d 1193, 1198 (5 Cir. 1977) (diversity case); *United States v. Masonry Cont. Ass'n. of Memphis, Inc.,* 497 F.2d 871, 877 (6 Cir. 1974) (§ 707(a) pattern or practice discrimination suit).

(c) *Proof of racial discrimination.*

■ The Supreme Court, in *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), held that a Title VII plaintiff must carry the initial

burden of establishing a prima facie case of racial discrimination, by showing that (1) he belongs to a racial minority; (2) that he applied for and was qualified for the job for which the employer was seeking applicants; (3) that, despite his qualifications, he was rejected; and (4) that after his rejection, the position remained open and the employer continued to seek applications from persons of plaintiff's qualifications. 411 U.S. at 802, 93 S.Ct. 1817.[9] The same burden for a prima facie case rests upon a plaintiff who seeks to establish a claim under 42 U.S.C. § 1981. *Long v. Ford Motor Co.,* 496 F.2d 500 (6 Cir. 1974); *Neely v. City of Grenada,* 438 F.Supp. 390, 406 (N.D.Miss. 1977). Since liability under § 1983 would, at best, be no more extensive than § 1981 liability, we find it unnecessary to give separate consideration to § 1983.

■ *McDonnell Douglas* firmly settled that once a prima facie case is made out, the burden shifts to the employer to "articulate some legitimate nondiscriminatory reason" for the employee's rejection; should the employer establish such reason, it then devolves upon the plaintiff to show that the employer's articulated reason was merely a pretext for racial discrimination. It is clear that it is not enough for the employer merely to *articulate* some nondiscriminatory reason, he must establish the truth of such reason by a preponderance of the evidence, and only then does the burden shift to the plaintiff to show, by a preponderance of the evidence, that the employer's articulated, nondiscriminatory reason was merely a pretext for racial discrimination. This order and allocation of proof were made clear by the Fifth Circuit in *Turner v. Texas Instruments, Inc.,* 555 F.2d 1251, 1255 (1977), where the court stated:

[t]he employer bears the burden of proving the legitimate, nondiscriminatory reasons for his actions by a preponderance of the evidence. Upon proof of a legitimate

F.2d 787, 796, n. 15 (5 Cir. 1977), *cert. denied,* 436 U.S. 962, 98 S.Ct. 3082, 57 L.Ed.2d 1129 (1978).

**9.** *McDonnell Douglas* pointed out that the facts will necessarily vary in Title VII cases, and the

specifications listed for prima facie proof are not necessarily applicable in every regard to differing factual situations. 411 U.S. at 802, n. 13, 93 S.Ct. 1817.

reason for the employer's decision, the plaintiff then bears the burden of proving by a preponderance of the evidence that the articulated reason is a pretext for racial discrimination.

That an employer's asserted reason for an employment decision is merely a pretext for discrimination may be demonstrated by showing an inconsistent application of the stated reason between whites and blacks, see *McDonald v. Santa Fe Trail Transp. Co.,* 427 U.S. 273, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976), or, in some circumstances, by statistical data which illustrates an employer's overall policies with respect to blacks, *McDonnell Douglas, supra* 411 U.S. at 804, 805, 93 S.Ct. 1817. The ultimate inquiry in such a case, of course, is "whether the employer is treating 'some people less favorably than others because of their race . . . .'" *Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957, 967 (1978).

■ Although *McDonnell Douglas* involved the order and allocation of proof in an individual case, its overriding principle, i. e. "that any Title VII plaintiff must carry the initial burden of offering evidence adequate to create an inference that an employment decision was based on a discriminatory criterion illegal under the Act," *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 358, 97 S.Ct. 1843, 1866, 52 L.Ed.2d 396, 429 (1977), has been applied in the context of class actions. *See Franks v. Bowman Transp. Co.,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 444, discussed in *Teamsters, supra,* 431 U.S. at 359–361, 97 S.Ct. 1843, 1867. In a class action where a pattern or practice of discrimination is alleged, the plaintiff's initial burden is "to demonstrate that unlawful discrimination has been a regular policy or procedure followed by an employer," *Teamsters, supra.* Such a pattern of discriminatory decisionmaking may be demonstrated by proof "of the expected result of a regularly followed discriminatory policy" or by an examination of a number of individual decisions, presumably along the guidelines established in *McDonnell Douglas. Teamsters, supra,* at 360, n. 46, 97 S.Ct. 1843. Once this prima facie showing is made, the burden then shifts to the employer to negate the inference of a practice of discriminatory policies.

Plaintiffs contend that members of the plaintiff class were discriminated against because of race by the city's hiring practices prior to 1975, because the subjective nature of the selection process resulted in the disparate hiring of white applicants to black applicants for fireman, police, and administrative positions as shown by annual hiring data and also by direct testimony of alleged discriminatees. Defendants interposed several defenses. They first deny that at any time they engaged in discriminatory hiring practices; they next assert that the number of blacks hired by the city bears a reasonable relation to the percentage of blacks of employable age who resided in Corinth and emphasize the significant number of blacks hired since 1975. Finally, the defendants challenge most, if not all, of the individual claimants on a variety of grounds to be discussed in greater detail.

■ Statistical evidence in racial discrimination cases is frequently a guide to just resolution since "statistics often tell much, and Courts listen." *Alabama v. United States,* 304 F.2d 583, 586 (5 Cir.), aff'd 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962) (per curiam). This is particularly true in the area of employment discrimination where statistical proof has often assumed a significant, if not dominant, role in the conduct of litigation in the ability of plaintiffs to make out a prima facie case. While use of statistical evidence has unquestioned viability in such cases, it is worthy of note that the value of statistical proof must, in the final analysis, be evaluated in the light of the total circumstances present in a given case. *Teamsters, supra,* 431 U.S. at 339–40, 97 S.Ct. 1843.[10]

---

**10.** The normal probative value accorded statistical data may be undermined by a small "sample size," *Ochoa v. Monsanto Corp.,* 473 F.2d

318 (5 Cir. 1973), or the fact that the position from which a member of the minority race tends to be excluded requires special qualifica-

In addition, the weight which should be given statistical proof in an employment discrimination case may be dependent upon which "theory" of discrimination is pursued. See *Teamsters, supra,* at 335, n. 15, 97 S.Ct. 1843. In "disparate impact" cases brought under Title VII, a statistical showing that tests having an adverse effect on a protected group establishes a prima facie case which shifts the burden to the employer to justify challenged practices. *See Griggs v. Duke Power Co.,* 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). Hence, in cases fitting the *Griggs* model, where the focus is on the *consequences* of a particular employment policy rather than discriminatory motivation, statistics play a major role in establishing a prima facie case. On the other hand, in "disparate treatment" cases, proof of discriminatory motive is essential; in these instances statistical evidence, while seldom conclusive, may be highly probative. *See McDonnell Douglas, supra,* 411 U.S. at 804, 805, 93 S.Ct. 1817; *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) (§§ 1981 and 1983); *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977).

 In assessing the effect of an employer's practices or policies concerning a protected group, courts have utilized two essentially different types of statistical comparison. One approach, often referred to as the "population/work force" formula, involves a comparison between the percentage of blacks in the employer's work force and the percentage of blacks in the relevant population area. The other, known as the "applicant flow" approach, makes a comparison between the percentage of blacks who are hired out of the total number of black applicants for the position as opposed to the percentage of successful white applicants. *See generally* Schlei and Grossman, Employment Discrimination Law, 1161–1176 (1976).

Plaintiffs' position finds support in the "applicant flow" principle. This principle was recognized in *Hester v. Southern Railway Co.,* 497 F.2d 1374, 1379 (5 Cir. 1974), where the court stated:

> The most direct route to proof of racial discrimination in hiring is proof of disparity between the percentage of blacks among those applying for a particular position and the percentage of blacks among those hired for the position.

*See also Vulcan Society v. Civil Service Comm'n.,* 490 F.2d 387 (2 Cir. 1973); *Green v. Missouri-Pacific R. R. Co.,* 523 F.2d 1290 (8 Cir. 1975).

The defendants contend that the blacks of employable age residing in the City of Corinth do not exceed 14% of the population, while the overall percentage of blacks *presently employed* in the fire, police and administrative departments is 21%. We are without sufficient evidence on which to reach a conclusion as to what percentage of the work force in the three departments was black at any given time during the period in question;[11] therefore, an accurate population/work force comparison is impossible. The evidence does show that the 1974 EEOC investigation revealed no more than 9% were blacks in the city's work force, all of whom except one were hired in the street, sewage and park departments. It is fairly clear that no more than 2 or possibly 3 blacks were employed as police officers at any one time during the period in question, and it is unquestioned that no blacks had ever been hired as firemen prior to December 1974 and no blacks had ever been hired in an administrative capacity prior to 1977.

Defendants further contend that the percentage of black hirees out of the total number of hirees for the years in question closely approximated the percentage of blacks in the relevant population area.

tions not possessed by the population in general, *Mayor of Philadelphia v. Educational Equality League,* 415 U.S. 605, 620, 94 S.Ct. 1323, 39 L.Ed.2d 630 (1974).

11. The only reliable work force figures are for the year 1979, which show an overall percentage of blacks presently employed in the fire, police and administrative departments to be 21%.

This position finds some support in *Robinson v. Union Carbide Corp.,* 538 F.2d 652, 654–58 (5 Cir. 1976), *cert. denied* 434 U.S. 822, 98 S.Ct. 65, 54 L.Ed.2d 78 (1977). In that case, the Fifth Circuit rejected applicant flow data favorable to the plaintiffs and adopted defendants' evidence to the effect that for the years in question the percentage of black hirees out of the number of total hirees was greater than the percentage of blacks in the relevant population area. In *Robinson,* one reason the applicant flow data was rejected was because there was evidence in the case that applicants had applied more than one time; thus the statistical data itself was unreliable. At any rate, the statistics presented by defendants in this case, unlike *Robinson,* rarely approach and never equal the percentage of blacks in the population area, except for the year 1974.[12] Therefore, even under the rationale of *Robinson,* defendants' statistics are inadequate to undercut evidence of discrimination.

This case presents us with a choice of which statistical data has greater probative force.

In the case sub judice, where the number of actual applicants and hires from each race may be gleaned from the record, and where no issue has been raised regarding the accuracy of such statistical data, *cf. Robinson, supra,* we think the approach espoused by *Hester* offers the most probative statistical analysis of the city's hiring practices in question. *See also Hazelwood School District v. United States,* 433 U.S. 299, 308, 97 S.Ct. 2736, 2742, 53 L.Ed.2d 768, 777–78 n. 13 (1977). That data, presented in detail at p. 8 *supra,* shows that from 1972 through 1975 a total of 75 of 380 white

applicants were hired in the three departments (19.7%), while 6 of 80 black applicants were hired (7.5%).[13] These figures suggest, if nothing else were considered, that the percentage of white hirees was nearly two and a half times as great as that of blacks on the basis of actual applications filed. We think these figures are a strong indication that the city's selection process operated to the detriment of black applicants and that race was a significant factor in its hiring practices. We need not rely, however, upon statistics alone to reach a conclusion that the plaintiffs have established a prima facie case of racial discrimination. Prior to December 1974, not a single black had ever been hired as fireman or in an administrative capacity and not more than 2 or 3 blacks had ever been employed at any one time in the police department, and then only under restrictive conditions relating to race. *See Jones v. Tri-County Electrical Cooperative, Inc.,* 512 F.2d 1, 2 (5 Cir. 1975). The city's claim that there was a small turnover in the fire department is not borne out by the record, which shows that a substantial number of whites were hired in that department almost every year. See p. 52, *supra.*

██ Furthermore, the ordinance's objective requirements for both firemen and policemen regarding minimum education and place of residence—both reasonable requirements in themselves, *see Washington v. Davis, supra; McCarthy v. Philadelphia Civil Service Comm'n,* 424 U.S. 645, 96 S.Ct. 1154, 47 L.Ed.2d 366 (1976)—were inconsistently applied by the hiring authorities, i. e., the board of aldermen, in favor of whites. Indeed, the ordinance itself was infected with a high degree of subjectivity. *Wade v. Mississippi Cooperative Extension Service,*

---

**12.** The statistical breakdown presented by defendants is as follows:

| Year | Blacks Hired/Total Hirees | Percentage |
|------|---------------------------|------------|
| 1968 | 2/24 | 8.3% |
| 1969 | 1/9 | 11.1 |
| 1970 | 0/13 | 0 |
| 1971 | 2/16 | 12.5 |
| 1972 | 2/29 | 7 |
| 1973 | 0/22 | 0 |
| 1974 | 3/21 | 14.3 |

**13.** Title VII became effective with respect to public employers on March 24, 1972. Statistical data from 1968, 1969, and 1970–71, presented supra at pp. 7–8, is nonetheless of probative force with respect to both Title VII and § 1981 claims and has been considered by the court. See *Hazelwood School District, supra,* 433 U.S. at 778, n. 15, 97 S.Ct. 2736.

372 F.Supp. 126, 142 (N.D.Miss.1974), *aff'd in relevant part* 528 F.2d 508 (5 Cir. 1976). The lack of any system of advertising job vacancies other than by word of mouth undoubtedly operated to the benefit of white applicants and to reduce the number of potential black applicants, for filling vacancies by word of mouth in a predominantly white work force naturally excludes blacks from easy access to such sources of information. *See Franks v. Bowman Transp. Co.,* 495 F.2d 398, 419–20 (5 Cir. 1974); *rev'd on other grounds,* 424 U.S. 747, 96 S.Ct. 1251, 47 L.Ed.2d 1251 (1976); *Long v. Sapp,* 502 F.2d 34, 40–41 (5 Cir. 1974). This case presents an apt illustration of that principle: the number of black applicants for positions in the all-white fire department was substantially less than the number of black applicants for police department positions, where at least a few blacks were employed through the years. The wholesale rehiring of former employees without the necessity of new applications operated to the detriment of black applicants whose applications had been placed on file and were not considered at the time of the rehire of former employees. Even more significant, the facts strongly indicate that the applications of blacks, in many cases, were not given any consideration whatsoever for job vacancies. A central purpose of our laws prohibiting racial discrimination in employment is to secure an equal opportunity for blacks to compete for job openings on the same basis as whites. That touchstone principle has here been disregarded by the city. The evidence in this case shows that only on rare occasions were black applicants called in for job interviews. This discriminatory result was practically foreordained, in our opinion, when the department heads, all white, were the ones to select the applications which they would recommend to the board of aldermen for favorable consideration. *See Rowe v. General Motors Corp.,* 457 F.2d 348, 358–59 (5 Cir. 1972).

From a consideration of all of the foregoing factors, it is reasonable to infer that the city's hiring policies not only had a disparate impact prohibited by Title VII but also established a prima facie case of a pattern or practice of purposeful racial discrimination under § 1981. *See Williams v. DeKalb County,* 582 F.2d 3 (5 Cir. 1978). The city attempts on several grounds to negate the prima facie showing made by plaintiffs. First, the city points to the communication between the city administration and the informal committee headed by E. S. Bishop in the 1960's as indicative of its good faith efforts to increase black employment. Undoubtedly, the total racial barrier to black employment in the police department was broken through the efforts of this committee. We cannot characterize, however, the city's efforts in this regard as a type of affirmative action to recruit blacks which might arguably negate the existence of a pattern of discriminatory decisionmaking. Second, the city argues that the statistical showing of plaintiffs is insufficient to establish a prima facie case, an argument which we have heretofore found to lack merit. We recognize that the existence of a racially-balanced work force, although not required by Title VII or any other law proscribing discrimination in employment, may be relevant on the question of an employer's motive when that question remains undecided. *Furnco Constr. Corp. v. Waters,* 438 U.S. at 580, 98 S.Ct. at 2951, 57 L.Ed.2d at 969. In any case, the city has failed to produce evidence sufficient to bring itself within that principle. We further note that the city presented no evidence with respect to the overall business necessity or any other justification for its hiring procedures. We thus conclude that the city has failed to rebut effectively plaintiffs' prima facie case as to the class.

(d) *Validity of individual claims.*

This leaves for our determination the extent of the city's liability for the past discrimination of which it has been guilty and what members of the class who testified are entitled to some measure of recovery.

We first consider the claims of the named plaintiffs Hazel Garner and Willie Pearl Beavers. Both applicants made out a prima facie case of discrimination in terms of *McDonnell Douglas* since each was a member of the minority race, each applied for and was qualified for a job with the police force, either as desk dispatcher, meter maid or safety patrolwoman; that despite their qualifications each was rejected, and, after such rejection, the positions they sought remained open and Corinth continued to seek applications from persons of like qualifications. As for Garner, the city presented as a defense that she was disqualified because of her residence outside the city limits, but this can be viewed in no other light than pretextual because the city permitted a number of white firemen and policemen to continue to hold their jobs, notwithstanding they lived beyond the city limits. The city also contends that a subsequently applying black was hired as a dispatcher, but made no showing that her qualifications or those of the whites also later hired were superior to Garner's. *See East v. Romine, Inc.,* 518 F.2d 332 (5 Cir. 1975). The subsequent hiring of a black, though probative of nondiscriminatory conduct, is inadequate to alter our conviction based upon total evidence that the rejection of Garner was racially premised. *EEOC v. Tufts Inst.,* 421 F.Supp. 152, 164–65 (D.Mass.1976); *Townsend v. Exxon Co., U.S.A.,* 420 F.Supp. 189, 193 (D.Mass.1976); *Wofford v. Safeway Stores, Inc.,* 78 F.R.D. 460, 470 (N.D.Cal.1978). The same discriminatory treatment was accorded to Willie Pearl Beavers on the basis of her applications in 1970, 1973 and 1974 when several vacancies existed. The evidence is she received no consideration on any of her applications. Instead, the record shows that all of the vacancies except one were filled by white persons who were not shown to have superior qualifications to Beavers. Again, the mere fact that a black, not shown to be more qualified than Beavers, was hired in October 1974 is not enough to overcome an otherwise overwhelming case of intentional discrimination.

As for certain class members, it is plain that they did not make out a prima facie case, and their claims must fail. As for Milus Copeland, the overwhelming evidence is that, when he applied, there was no vacancy in the position of city clerk. As for Laverne Copeland, it is no less clear that she was not available to accept the job of mayor's secretary when the position became open. Larry Betts was disqualified because of his age on his original application. Thereafter, he was hired as a police officer and has remained so employed until the present date. Thus, he has no claim for relief in this case. John Swinney, who applied for a job in the fire department, failed to make out a prima facie case because the record showed that after Swinney filed his application there were no new hires in the fire department for the remainder of that year or the next. In other words, he applied for a position when there were no vacancies existing or in prospect. Louis Crawford fails on his claim for the reason that since he had no more than a 7th grade education, he failed to meet the minimal objective requirement for completing the 8th grade in an accredited public school. This requirement was not shown by the evidence to have been waived or varied by the city in its employment practices. Finally, Terry Coleman, Jr., who, although he applied with the city for position as fireman, had been employed at a higher paying job by Southbridge Plastics and was on strike at the time. We find the fact to be that Coleman was not genuinely interested in obtaining a lower paying city job and that his filing of an application could, in no event, be regarded as more than seeking part-time, limited employment; his intentions were to return to Southbridge Plastics as soon as the labor dispute was ended.

As for the other class members who testified, i. e. Robert Copeland, Robert White, Larry Wade, Mary E. Alexander, Quance Crenshaw, Tommy Swinney, we are satisfied that each of these individuals made out a prima facie case of racial discrimination which was not effectively rebutted by the city.

The city cannot explain in its brief, and therefore it must be taken to concede that there were no objective reasons for not hiring Mary E. Alexander and Quance Crenshaw.

As for Robert Copeland, the city contends Copeland never made application for a policeman's job, a defense which we have rejected by finding that on several occasions he had made employment applications with the city. The fact that he later was employed by a local industry making higher wages than he could have been paid by the city is no defense to his claim of racial discrimination.

As for Robert White, the city contends that he was a functional illiterate and lacked basic educational qualifications although he attended public school in Corinth and completed the 11th grade. Plaintiffs effectively rebutted this claim by demonstrating that White's ability to read and write approximated that of two white police officers, Blakely and Miller, both of whom were hired in 1973.

Larry Wade successfully made out a prima facie case of discrimination in that, though there were vacancies, he was never called in for interview and numerous whites thereafter hired as policemen and firemen, were not shown to have superior qualifications to Wade. The only defense offered by the city is that of the patrolmen later hired, one was a black applicant. We find this sole fact insufficient to overcome the prima facie case of racial discrimination made out by Larry Wade.

In the case of Tommy Swinney, the proof unquestionably makes out a prima facie case of racial discrimination under the *McDonnell Douglas* rationale, and the city's defense that it had the right to exercise reasonable discretion fails for lack of legal substance.

Considering all of the evidence presented by the record and resolving the conflicts which appear therein, we, as the finder of the fact, conclude that the city was guilty of racially discriminatory hiring practices in the pre-1975 period in the fire, police and administrative departments. We are equally persuaded that since 1975 the city has followed more objective standards for hiring policies and on the basis of results, for example the racial makeup of the 1979 work force, it is unquestionably clear that racial discrimination no longer obtains in the City of Corinth with respect to the three departments in issue. It is immaterial whether this significant change is due to the filing by the NAACP organization of the charge with the EEOC, or the election and efforts of alderman Bishop, or more consistent application of employment criteria. The important fact is that Corinth has now ceased to discriminate on the basis of race in the hiring of personnel in its police, fire and administrative departments.

(e) *Relief.*

■ In view of the city's present policy of nondiscriminatory hiring in the fire, police and administration departments, it would be inappropriate to grant injunctive relief. Nevertheless, the evidence justifies our granting declaratory relief that the city in the past has discriminated on account of race in the three municipal departments and remains under a duty to continue its present racially nondiscriminatory hiring practices.

■ Class members who have been discriminated against are presumptively entitled to back pay. The determination of back pay must be made on an individual basis, and the city is not foreclosed from showing that certain class members, not covered in this opinion, were not, in fact, victims of discrimination. Examples of nondiscrimination would be objective disqualification of an applicant, or the lack of a vacancy within a reasonable time after application was made. The burden of showing nondiscrimination rests upon the city. The amount of back pay due any individual shall be governed by the several guidelines established in *Pettway v. American Cast Iron Pipe Co.,* 494 F.2d 211 (5 Cir. 1974). Recoveries will be dependent upon whether an individual is entitled to Title VII relief, in which case the back pay

award shall not extend more than two years prior to the filing of the EEOC charge, 42 U.S.C. § 2000e–5(g) (1974); as to persons time-barred from Title VII relief, their recovery of back pay under § 1981 could not, under then effective Mississippi law, extend for more than three years prior to the filing of the action, *Johnson v. Goodyear Tire and Rubber Co.,* 491 F.2d 1364, 1379, n. 49 (5 Cir. 1974).

Because of the various aspects involved in determination of back pay awards to a class of persons, we shall assign to a United States Magistrate the task of ascertaining the correct amounts due to each individual and, after taking such evidence as may be necessary, make recommendations to the court.

The court reserves the question of allowing reasonable attorney fees to counsel for plaintiffs until the back pay claims have been resolved.

Let Judgment be entered accordingly.